Good morning and welcome to the Ninth Circuit Court of Appeals. Counsel, I have to do just a little bit of housekeeping, so it will be just one minute if you don't mind. My name is Morgan Christen. I'm one of the judges on the circuit court. My chambers are in Anchorage, Alaska. I'm sitting this week in San Francisco with my colleagues to your left, Judge Lee, whose chambers are in Southern California, and Judge Bress, whose chambers are right here in San Francisco. We have a few cases that I need to note for the record that are submitted on the briefs. In these cases, we will not hear oral argument. The first is 23-3559, Carrillo v. Madison, and the second is 24-3858, Singh v. Bondi. The first case on the argument calendar is Rishal v. Fox, 24-1722. So now we're ready to hear your argument. Good morning. Good morning. Jeffrey Jones for the appellant, Andrew Rishal. I would like to reserve five minutes for rebuttal, if I could, please. Sure. Just watch the clock, please, sir. Absolutely. Mr. Rishal's defense counsel was ineffective by refusing to allow the trial court to instruct the jury on the lesser offense of imperfect self-defense as a basis for voluntary manslaughter. And the California Court of Appeals unreasonably applied Strickland in finding that that was a reasonable trial tactic. And it couldn't be seen, it should not be seen, it cannot reasonably be seen as a reasonable trial tactic because, first, it violated California law. Attorneys aren't allowed to gamble with an all-or-nothing verdict. And especially under these facts, that was an unreasonable decision. I don't understand this argument because it seems to me that especially under these facts, it would have been an impossible argument. So can you help me out? I'm speaking of the forensic evidence, of course, you know. I think perfect self-defense was an impossible argument. There was evidence that the victim, Mr. Patterson, attacked Mr. Rishal in the bedroom with a knife. It was undisputed that the fight began in Rishal's bedroom, and there was evidence that Patterson attacked him with a knife. But he didn't ---- Hold on. Hold on. But there's a whole lot more forensic evidence, right? Indeed. And that's what's the focus of my question because the evidence is that that fight continued sort of throughout the House. Yeah, yeah, yes. Right? And that the victim was, I think, the logical inference, you know, trying to escape. And then the ---- and I think that Mr. Rishal's footprint is, of course, coming and going. That's true. So he can only use, to paraphrase and to summarize, he can only use the amount of force necessary. True. To protect himself. So how is this a viable defense? I think that's precisely why unreasonable self-defense applies here. And reasonable self-defense doesn't have a chance for the reasons you're saying. Because the lethal force was applied in the kitchen. That's where the fight ended. The fight ranged through the House. It could have been that the victim was trying to escape, that Mr. Patterson was trying to escape. It could also be they had they engaged in mutual combat throughout the House. So for imperfect self-defense, you think there's a viable shot that the jury would ---- I mean, that has to be your argument, right, a viable shot that the jury would decide on this evidence that Mr. Rishal sincerely but unreasonably believed that this amount of force was necessary. So how would that play out? Well, he's attacked in his bedroom, and the prosecution has the burden to negate imperfect self-defense as it does with full self-defense. He's attacked in the bedroom, and he reasonably perceives an imminent threat there. But he's engaged in mutual combat throughout the House. And he would be in a very distraught emotional state where he could unreasonably perceive Patterson to still be a threat, even though he was too wounded to actually be a threat. Maybe for part of it, there's a final blow. I think the inference was a final blow to the back of the head. There was evidence that suggested that possibility, yes. So how was that necessary? I don't believe that was necessary, which is, again, why unreasonable self-defense. No, but how would the jury likely decide that your client thought that was necessary? Maybe incorrectly, but that he reasonably believed that that use of force was still required? That he could unreasonably – that if he was in an extreme – an extremely emotional state, that he could unreasonably think that if he got caught up in the heat of combat. Okay. But reasonably, no. I agree that reasonably – there's no argument that he could reasonably think that it was necessary to strike that blow in the kitchen. I think that's one inference from the evidence that – but definitely, there was a lot of fighting in the kitchen, and that was the end of the fight. That's why – Couldn't defense counsel have just felt that the imperfect self-defense theory just didn't really match the facts? That if there was a self-defense here, it was a true one because it was a real fight, and that's what he was trying to do, as opposed to saying he was in a fight, but he unreasonably perceived that the fight would be dangerous to him? I think that would be reasonable if the fight was limited to the bedroom. If there was evidence that Patterson attacked Rishal in the bedroom, Rishal kills him in the bedroom in self-defense. But with the fight ranging through the house and Patterson being stabbed 30 times, I think unreasonable self-defense fits the facts, and reasonable self-defense is simply a non-starter. But is an excessive use of force part of an imperfect self-defense theory? To say why – I mean, if you unreasonably believe you're under a risk of death, but then you use excessive self-defense, is that part of this theory? Does that take you outside the theory? I don't believe so. I think – I mean, Rishal applied deadly force in the kitchen, and if he perceived – at some point, if he continues to apply – if he continues to apply force, that needs to be – that would need – under self-defense, that needs to be justified. But so what was the defense that was actually put forward, then? Perfect self-defense, that Mr. Rishal had a reasonable – that had a reasonable – he had a reasonable fear of death or bodily injury, imminent fear, and that he acted reasonably in response to that. Was the idea that he – that it was unreasonable, or perhaps unreasonable, but sincere if he sort of got caught up in a frenzy and just couldn't stop? Yeah, essentially, I think. Because it went from room to room. Was there any testimony about the – about temporally how long this would have taken? I don't – I don't believe anybody – anybody suggested that. I mean, it was clearly – it was clearly that the fight happened in multiple rooms. There was kind of – there was blood everywhere. I don't recall anybody theorizing about how many minutes – how many minutes passed. Okay. But apparently, I'd say, you know, it was at least a few minutes. It would have to be. One would think. Yeah. Okay. What about the issue of the jury instruction that was – that everyone concedes is incorrect? Yeah. Yes. Can you address that? Absolutely. I think the potential there is to – is simply that it could confuse the jury. That it was – you know, it's supposed – the instruction is supposed to say either he intended – you know, intended to assault with a deadly weapon or he formed that intent after he – he either entered the house with that intention or he had it all along. And making that – making that – turning that from a disjunctive to a conjunctive requirement, I think – I mean, the argument against it is, well, under the defense theory, he would have to have – he would have to have formed that intent before. But there was no evidence what Patterson's intent was before he entered the house or how he got in the house. There was no evidence that he was – that there was a social distance. Right. I mean, that's one of the oddities of the case is that the circumstances under which he – by which he entered the house or why he entered the house are not clear. Very unclear, yes. Entirely unclear. Yeah. But which way does that cut? Prosecution knows the burden. I think it – I think it cuts in that the prosecution didn't show that – that there was no – there was no evidence that – that Patterson lawfully entered the house. I mean, there wasn't direct evidence, but there was circumstantial evidence that Patterson was angry at – at Rachel, so –  Right. And that he wasn't coming in to just a friendly visit, something bad. No, indeed, yes, indeed. There was no – there were really no reasonable inferences that they were – that they would engage in a social visit since they hated each other. Right. Yeah. So what Patterson was doing there, there was – there wasn't any direct – as you said, no direct evidence as to that. But I think – I think you could reasonably infer that it was a – that he visited for a hostile purpose. In large part, though, I struggle with what the jury was left with by way of theory, defense theory. And I appreciate your point that the prosecution had the – had the burden. But we're looking at IAC claims, and it just seems to me that there's pretty strong evidence from the post-conviction phase about the extent to which defense counsel's hands were tied by his client. I mean, there's certain evidence that Mr. Breschall didn't want introduced. Didn't want introduced. So the jury was left without a coherent theory, it seems to me. Why was he there? How did he get in? Just that they had been feuding. And again, yes, there was no evidence as to how – as to what – why Patterson went there or how he entered the house. Was there – was there witnesses that were – that could have testified to this that trial counsel made a decision not to? Yeah. In the – which came in in the habeas – the habeas proceeding, the four witnesses that – Yeah. Can you speak to that? Yes. That would bring in a whole different theory, that those witnesses would have testified that apparently – those witnesses would have testified apparently that the two were friends. And, you know, for each of those witnesses, there's essentially a one-page summary. It's from the DA's – the DA's investigator. But we also know from defense counsel why they weren't used, and it seems to be a tactical decision to not use them. Yes. Yes. That does seem like a tactical decision. I think – I thought you contend that – that, too, was ineffective. I do. Yes. That's – I – So why – why was it ineffective? Well, I think it – presenting the – presenting those testimony – those witnesses' testimony and negating the apparent – one of the main prosecution witness testified regarding this feud, and that's all the jury heard was about the feud. These witnesses would have refuted that testimony. It refutes the prosecution's theory of motive entirely. Then – but then we're in a whole different case if there's no – if there's no evidence of motive and – and – but – but a reasonable defense attorney would have refuted the prosecution's case about murder. And there was some conflict. There was some conflict between client and counsel about – about presenting that evidence. But I think it's – it's clear that Mr. Rishal wanted his attorney to conduct that investigation. And it's simply – it's hard – it's a failure to investigate. There's no reason not to – not to interview those witnesses and see – maybe – maybe it wouldn't have panned out, but the attorney never even – the attorney, just based on the DA's investigator report, he simply didn't pursue the matter. Judge Lee, do you have questions? No. Judge Gress, do you have additional questions? I'm okay for now. Okay. Do you want to reserve the remainder of your time? Yes, please.  Thank you. Good morning. May it please the Court, Jill Thayer for the respondent, Al Peli. I think this Court is obviously very well aware of the facts. Which, at this point, once you're aware of the facts, it's very hard to find that Mr. Lempert rendered ineffective assistance. I'll just add that there's no clearly established authority anywhere that says that a defense attorney must request lesser-included offense instructions. That's all, you know, California law. And it's very clear that Mr. Lempert thought about this long and hard. And it does make sense. Certainly, another attorney might have chosen a different approach. But his idea was that he was going to rely on the he came at me with a knife and the circumstances that was, that Mr. Richelle was in his own bedroom. And to try and then turn that into, okay, if you believe he said he came at me with a knife in my bedroom, because that was where it happened initially. And then to try and say that it might have been unreasonable for him to defend himself when he was being attacked with a knife in his bedroom by a larger man. You know, he'd have to make that argument. And that argument is, I'll just say, difficult to make. Absurd, really, to say that it would have been unreasonable for Mr. Richelle to have defended himself. And that is what imperfect self-defense voluntary manslaughter is. Is it, I mean, if he used an excessive amount of force in responding to a reasonable threat, is that, does that get you within imperfect self-defense? That's a whole nother point. Is that, I mean, that would have just worked maybe in the bedroom. But of course, in the facts of this case, Mr. Patterson obviously was the one who lost a lot of blood in the bedroom. So even if he had been attacked, you know, attacked Richelle, which is doubtful. Then Mr. Richelle was able to stab Mr. Patterson many, many times. His cell phone was- Mr. Patterson made it down the hallway and into the kitchen and I think ultimately to the driveway. So, right, and then there's the very problematic blow to the back of the head. After he was down in the kitchen, it just seems very likely that a jury was not going to go that route. No, not at all. What about the imperfect jury instruction that was error? It was error. And the state court noticed, noted that it was error and recognized the error and reviewed it under Chapman and said that it was not prejudicial under Chapman. And there's just no way that their conclusion that it was not prejudicial, the error was not prejudicial, was unreasonable. I mean, for one thing, there's the whole used excessive force part, right? Because if you're attacked in your home, you cannot use excessive force. And there was obvious, obvious, obvious evidence of him using excessive force on Mr. Patterson. He was incapacitated and crawling down the hall until he got to the kitchen. He had already lost a lot of blood. But wasn't Rochelle injured too in this? Well, his blood was not found in the bedroom. His blood was found in the kitchen. And the evidence seemed to show that when Mr. Rochelle stabbed Mr. Patterson in the back of the head, he broke the knife blade and he stabbed him so hard that he cut his own hand. So that his hand slipped on the knife. Yeah. Yeah. And I will note that there was one knife. It's not 100 percent clear, but I think this Court has probably looked at the actual testimony, which is even more horrible. But there was just one knife. And there was, the blade was found in the kitchen, and the handle was found in that garbage can. And they matched, and it was a kitchen knife. And under Chapman, the error has to be harmless beyond a reasonable doubt, right? That's correct. And then, can you address that in the context here? That's a pretty high bar to show that every reasonable jurist would find that this was harmless, this error was harmless beyond reasonable doubt. Yes, it is a high bar. It is a very high bar, and the Court of Appeal recognized that. And it looked at, first, the amount of error from the instruction. And we don't know what happened, precisely what happened, between the time Mr. Richelle, I mean, the time Mr. Patterson went into the home. But we do know that the defense theory was that Mr. Patterson intended to assault, came in with evil intent, and then proceeded to come at him with a knife. That was really all the very slim evidence they had. There was no argument that Mr. Patterson initially had planned to have a nice meeting. And then, suddenly, in the middle of something happened, and then he turned on him, and then came after him with a knife, there's Mr. Richelle with a knife. There's just no evidence. There's no, there's nothing to hang your hat on, and that's what we're stuck with. What about the prosecution's theory about Mr. Patterson coming into the house? Did you guys address that at all? Well, the theory was that he, well, essentially that he was lured in. And the facts in support of that- How was he lured in? What did the record show as to why that would be? Well, because Mr. Patterson's truck was parked in the driveway with, and it was locked, and there was a club lock on it. And Mr. Richelle's truck was parked blocking in Mr. Patterson's vehicle. Well, that goes to the victim not having a plan to make a quick getaway. But I think the question is, what was the evidence about him being lured in? Well, just that he thought he was, they were having a conflict. We know that Mr. Richelle had said he could kill him. But then they were communicating a lot. So some of the evidence is all those phone calls that they had. There were many, many phone calls in the days leading up to the murder. And honestly, that could go any which way. There was some evidence that, obviously, they had a dispute over a construction project, but there was also evidence, I guess, that they were friends and would go out drinking together even. And doing drugs together, a lot of drugs together. Yes, there was evidence of that. Was there an alternative narrative that the defense counsel could have put forward with other witnesses that the jury didn't hear about either some sexual relationship between the two or the conflict over the construction project being over by that point? Well, I'll start with the sexual relations, and it's obvious, it is just truly obvious that introducing evidence that Mr. Richelle had made sexual advances towards Mr. Patterson would not have assisted in his defense. I mean, it was entirely reasonable for him not to want to introduce that evidence, even if it was all by himself, let alone the fact that Mr. Richelle said that he would fire him if he tried to do that and insisted that he had never made unwanted sexual advances to Mr. Patterson. I mean, that was just, they absolutely did not want to introduce that evidence for multiple reasons. What about the narrative about the business relationship? Well, that was all very confusing, and Mr. Richelle did not manage to prove that it had all been resolved or resolved in his favor or anything else, and that is what the Superior Court found. The Superior Court looked at all the evidence and said, this really doesn't show what you think it shows, and it was very far afield from what happened. And, well, Mr. Richelle's, one of his many, many problems, in addition to all the horrendous, grotesque physical evidence, was that he couldn't testify, because, of course, if he testified, then even more evidence of his background would have been admitted, and so Mr. Lempert did not have a lot of choices. Judge Brest, do you have additional questions? Okay. Judge Lee? Okay. I don't think we have any additional questions. Thank you. Thank you, counsel. First, if I could address the concern you've raised, Judge Brest, about the use of excessive force and how that can fit the doctrine. I think here it's a question of force being applied over some period of time in a fight that ranged through the House, and the question then becomes not whether the force was excessive, looked at in total, but whether when the lethal blows were delivered in the kitchen, which were the final lethal blows, whether there was a sincere perception of imminent threat at that point. How does, okay, I mean, I hear you, but how does that get to the debate we're having about which, whether he should have asked for a voluntary manslaughter instruction? Well, I think because since Mr. O'Shall needs to have a under perfect self-defense, he'd have to have a reasonable perception of an imminent threat in the kitchen, and Mr. Patterson was simply too wounded for that to be reasonable, given all the physical evidence in the case, that there's going to be a reasonable threat in the kitchen when the prosecution has the evidence of 30 knife wounds, and it's unreasonable because of, because he was in an overwrought, an overwrought state, and, you know. And I guess the question one would have is, is this just a problem for your client's case, regardless of the theory that's advanced? I, yes, it is, it isn't a good fact for the defense, but it fits, it fits in perfect self-defense. It doesn't fit perfect self-defense. That's, I think the perfect self-defense is simply out of the question. Imperfect self-defense is a viable, is a viable theory, I think. It's still, it's, of course, it's not a great, the physical evidence isn't great for my client, but I think there's a reasonable probability that the jury could reach a different result as to if they have an unreasonable self-defense option. And California requires them to give an option, which isn't, I'm not arguing a violation of state law, but that it's deficient, it's a deficient performance to take that gambler's approach, especially under, under these facts. The jury could have given an option. Counsel can still pursue perfect self-defense if he actually thought that was viable. It's hard to imagine, but imperfect self-defense, the jury should have been given a choice. And then it's not, you know, then it's, the jury was, you know, given a choice. And the consequence if they had found him guilty of voluntary manslaughter, what's, what's the difference in the sentences that he's given? Eight years, as opposed to, eight years as opposed to, well, it would be eight years plus the knife enhancement, I assume, and since it's involuntary, since it's imperfect self-defense. So he'd get, he would have got nine years as opposed to getting 26 to life, is what he received. Questions? I'm okay. Counsel, it doesn't seem that we have additional questions. Would you like to wrap up? Yes, I'll wrap up. Thank you, Your Honor. Okay. We'll take that case. Thank you both for your advocacy. We appreciate it very much. We'll take that case under advisement.
judges: CHRISTEN, LEE, BRESS